**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, David T. Palczewski, being duly sworn, state as follows:

**Introduction and Agent Background**

1. I am a Border Patrol Agent (BPA) of the United States Border Patrol (USBP), a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been so employed since February 5, 2009. I have been assigned to the Richford, Vermont Border Patrol Station (Richford Station) as a BPA for approximately 3 years and currently serve as the station's Prosecutions Agent. I was previously assigned to the Calais, Maine Border Patrol Station as a BPA for approximately 10 years and to the Santa Teresa, New Mexico Border Patrol Station for approximately 1 year.

2. This affidavit is offered in support of an application for a criminal complaint. I believe the facts contained in this affidavit establish probable cause that on or about January 4, 2024, in the District of Vermont, Luis Fernando Barragan-Palacios (BARRAGAN) transported aliens in furtherance of their illegal entry while knowing or recklessly disregarding the fact that they were aliens who had illegally entered the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

3. I have not set forth all facts I know from my investigation into this matter. Rather, I have only included facts sufficient to establish probable cause that BARRAGAN committed the described offense. I am familiar with the facts and circumstances described below from my own investigation and from my discussions with other agents involved in the investigation. Unless otherwise specified, the statements described herein are related in sum and substance and are not intended as direct quotations.

1

## Probable Cause

1.  On January 4, 2024, BPA Adam Birchard was travelling west on Route 105 in Jay, Vermont. At approximately 5:50 A.M., BPA Birchard observed a light gray-colored Ford F-150 truck with a New York license plate pulled over onto the shoulder of the north side of Route 105 as he drove past in his unmarked service vehicle on his way to the Richford Border Patrol Station. The vehicle had its headlights and hazard lights activated. At the early hour, it was pitch black with no background light, illumination, or roadside lighting. Route 105 travels over the top of a large mountain. At the top of the mountain there is a small parking lot for vehicles to pull off the road on the northwest side of Route 105. The area is pictured below.



2.  A gated private road leads from the parking lot, travels north, and ends at the international border with Canada. From the same parking lot, there is also access to the Long Trail, a hiking trail that terminates at the Canadian Border in an area known as Journey's End. Along the border to the north of Route 105, the Vermont Association of Snow Travelers (VAST) trail system

is used by snowmobiles in winter months. The VAST trail parallels the border in places and is a wide-cut trail. Based on the training and experiences of agents assigned to the Richford Border Patrol Station, we are aware that—because of the access to the VAST trail, the private road, and the Long Trail—this area along Route 105 near the top of the mountain remains an attractive location for people to facilitate human smuggling and narcotics trafficking.

3. The Ford F-150 was pulled over on the northwest side of Route 105 approximately one-quarter mile northeast of the small parking lot at the top of the mountain. Almost directly across the road from where the Ford F-150 was pulled over is a short, one-lane pull-off that would provide more room for a vehicle to safely get off the road and out of the lane of travel. The area is pictured below. Based on his training and experience, BPA Birchard found it unusual that a vehicle would be pulled over on the shoulder with flashers engaged when there was a more viable and safer pull-off nearby as well as the parking lot approximately one-quarter mile east at the top of the mountain. The unusual location of the Ford F-150 indicated that the vehicle was likely not from the area and was not familiar with the road or the availability of other places to pull off the road safely.



4. BPA Birchard also believed, based on his training and experience, that it was unlikely that the Ford F-150 was picking up or dropping off hikers as the land around the road is very steep and rocky. The Long Trail crosses Route 105 across from the small parking lot and continues down the east side of the parking lot. BPA Birchard has traveled this road at this time of day for many years and has not observed a vehicle pulled off in the location where the Ford F-150 was pulled off.

5. BPA Birchard continued past the Ford F-150 and pulled into the small parking lot at the top of the mountain. BPA Birchard turned around to drive eastbound on Route 105. Once he pulled back onto Route 105, he observed headlights driving westbound (toward him) and noticed that it was the Ford F-150. BPA Birchard traveled approximately one-quarter mile to the vehicle pull-off across from where the F-150 had been pulled onto the shoulder. BPA Birchard then turned his vehicle around again and traveled westbound on Route 105 to catch up to the Ford F-150.

6. Westbound Route 105 in that area is a single-lane downhill road. At the time, it was dark, cold, and lightly snowing, such that the average driver would drive cautiously as he or she descended downhill. The normal traffic speed on Route 105 in this area is 50 miles per hour (MPH). BPA Birchard was driving approximately 75 MPH to catch up to the Ford F-150.

7. After traveling approximately five miles west on Route 105, BPA Birchard encountered a white van near Johnson Road in East Richford, Vermont. When BPA Birchard was behind the white van, he noticed the white van was traveling at approximately 55 MPH. During this time of day, there is little to no vehicle traffic on Route 105. BPA Birchard believed that the driver of the Ford F-150 may have noticed him turn around at the top of the mountain and then may have decided to pass the white van at an excessive rate of speed to avoid encountering BPA Birchard.

8. BPA Birchard passed the white van, increased his speed to approximately 85 MPH, and continued driving west on Route 105 toward Richford. After traveling approximately six miles, BPA Birchard reached Richford, Vermont, where the posted speed limit on Route 105 is 25 MPH. BPA Birchard had still not seen the Ford F-150. He therefore believed it was driving at an excessively high rate of speed because he did not catch up to it after driving approximately 11 miles, well in excess of the speed limit himself.

9. Based on my training and experience, I am aware that alien smugglers that operate in Richford, Vermont, will tend to travel west on Route 105 as an egress route from the immediate area. BPA Birchard decided to continue west on Route 105 to search for the Ford F-150. BPA Birchard turned left to continue on Route 105 and drove approximately one-quarter mile. At that time, he observed the rear lights of three vehicles traveling on westbound Route 105. BPA Birchard caught up to the group of vehicles and identified the Ford F-150 in the middle of the other vehicles.

10. BPA Birchard followed the vehicles west for approximately one mile and then activated his service vehicle's emergency lights. The vehicle in the rear yielded, and BPA Birchard passed that vehicle, positioning himself directly behind the Ford F-150. Route 105 in this area is straight and has a shoulder wide enough for a passenger vehicle to leave the roadway safely. Nevertheless, the Ford F-150 continued to maintain its speed rather than immediately yield to BPA Birchard's service vehicle. After approximately 1 mile, the F-150 finally yielded at the intersection of Route 105 and King Road.

11. With illumination from other vehicles passing on Route 105, BPA Birchard was able to see two people in the front seats of the Ford F-150. BPA Birchard approached the passenger side of the Ford F-150 and knocked on the window. The window rolled down, and BPA Birchard identified himself as a United States Border Patrol Agent. BPA Birchard observed a female in the

5

front-passenger seat and a male in the driver's seat. He then asked where they were travelling this morning. The male driver, later identified as BARRAGAN, asked "Why do you need to know?" and "Why am I being pulled over?" BPA Birchard instructed BARRAGAN to turn off his vehicle, and BARRAGAN complied.

12.    BPA Birchard asked BARRAGAN how many people were in the vehicle. BARRAGAN replied, "4 or 5, I'm not sure." BPA Birchard noted that it was unusual for a driver not to know how many people were traveling inside his vehicle. BPA Birchard also did not observe any occupants in the vehicle. He only saw the driver and front-seat passenger.

13.    BARRAGAN continued to ask for the reason he was pulled over. BARRAGAN then instructed the female passenger to record the encounter on her cell phone. BPA Birchard instructed BARRAGAN to exit the vehicle. BARRAGAN did not initially exit the vehicle and continued to ask for the reason he was pulled over. BPA Birchard asked BARRAGAN to exit the vehicle three times before BARRAGAN finally complied and exited the vehicle.

14.    BPA Birchard asked BARRAGAN for identification. BARRAGAN stated he was from New York City and provided a New York City Identification Card with his information and an address in Corona, New York. BPA Birchard asked BARRAGAN if he had a driver's license, and BARRAGAN replied that he did not but that his partner—the front seat passenger—did.

15.    BPA Birchard explained that he pulled over BARRAGAN's vehicle based on his initial observation of it having been pulled over on Route 105. BARRAGAN responded that "my partner was pregnant, and she needed to pee, so I just pulled over." BARRAGAN then claimed that he has been issued a U-Visa and that his partner has asylum in the United States.

16.    BPA Birchard asked BARRAGAN who the other people in the vehicle were. BARRAGAN replied that the people in the back seat are "just ordinary people". BPA Birchard

6

had not noticed anyone in the back seat when he approached the vehicle. BPA Birchard noticed that the bed of the vehicle was covered by what appeared to be a homemade wooden cover painted black. BPA Birchard asked BARRAGAN what was in the bed of the vehicle. BARRAGAN immediately looked at the ground and said, "Yes, there are two." BPA Birchard clarified with BARRAGAN if there were two people in the bed of the truck, and BARRAGAN replied, "Yes". BPA Birchard placed BARRAGAN in handcuffs and informed him that he was being detained for suspicion of alien smuggling. BARRAGAN stated that "they are going to hurt me if they find out" and "they made me do it." BPA Birchard asked who "they" were, and BARRAGAN replied, "Bad people that I tried to get away from."

17. At approximately 6:15 A.M., BPA Stephen Holbrook arrived on scene to assist BPA Birchard. At this point in time, it was approximately 25 degrees and snowing. The constructed wooden cover had an approximately two-inch air gap between the tailgate and the end of the cover. Both BPAs opened the tailgate of the truck and discovered two people laying down with a heavy blanket. BPA Birchard told the subjects to exit the vehicle. BPA Birchard and BPA Holbrook then searched the rear seat of the vehicle and found four other people. The rear seats were designed for three occupants and were only equipped with three seatbelts.

18. BPA Birchard asked BARRAGAN if he had been planning on returning directly back to New York City. BARRAGAN stated that they were "going straight back." BARRAGAN did not indicate any plans to stop or check on the individuals lying in the bed of the truck.

19. Additional BPAs arrived on scene and transported the six subjects discovered inside the back seat and bed of the truck to the Richford Border Patrol Station to determine their legal status in the United States. BARRAGAN and the female front-seat passenger were also detained and transported to the Richford Border Patrol Station for further investigation.

20.     At the Richford Border Patrol Station, agents took the fingerprints and biographic information of the six apparent migrants and entered them into the E3 Nextgen Fingerprint Database. Four of the subjects claimed to be citizens of Mexico, and two of the subjects claimed to be citizens of Guatemala. The database returned no match for any of the six subjects having valid admission documents or applications to enter or remain into the United States.

21.     At the Richford Station, BPA David Palczewski interviewed two of the apparent migrants discovered in BARRAGAN's vehicle. The subjects were read their *Miranda* rights, agreed to be interviewed without an attorney present, and gave consent to searches of their cellular devices. The interviews were conducted with the assistance of a Spanish interpreter.

22.     One of the subjects, identified as Kener Osvaldo Moran-RUANO, claimed to be a citizen of Guatemala and did not have legal status to enter the United States. RUANO claimed that he paid an alien smuggler in Canada $2,000 to smuggle him into the United States. RUANO and the five other subjects were escorted by the alien smuggler to an unknown location in the United States along a road and told to wait for a truck to pick him up. A truck stopped in front of RUANO, and he heard someone yell "get in." RUANO ran to the truck and entered the bed of the truck.

29.     The other interviewed subject, identified as Ana Isabel De La Cruz-ROMAN, claimed to be a citizen of Mexico and did not have legal status to enter the United States. ROMAN said she found an alien smuggler in Canada that was willing to get her into the United States. ROMAN did not have any money for the trip. ROMAN said the alien smuggler would still bring her into the United States, but she was going to have to work for the smuggler to pay off her debt. ROMAN did not know where she would be taken or what kind of work she would be performing. When asked if she still had her passport, ROMAN said she had lost it in the woods while walking to the pick-up stop. ROMAN said that she was blind folded while walking through the woods to

the pickup location and that someone had escorted the group from the border and into the United States. She was told a white truck would arrive to pick them up.

## Conclusion and Request

23. Based on the foregoing, I submit there is probable cause to believe that on January 4, 2024, in the District of Vermont, Luis Fernando Barragan-Palacios transported aliens in furtherance of their illegal entry while knowing or recklessly disregarding the fact that they were aliens who had illegally entered the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). I request the Court issue a complaint charging him accordingly.

Dated at Burlington, in the District of Vermont, this 5th day of January 2024.

_____
DAVID T. PALCZEWSKI
Border Patrol Agent
U.S. Border Patrol

Attested and sworn to before me in Burlington, Vermont on this 5th day of January 2024.

_____
HON. KEVIN J. DOYLE, Magistrate Judge
United States District Court
District of Vermont

9